IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RONNIE MULLINS,

        Plaintiff,

v.                              **CIVIL ACTION NO. 1:06cv105**
                                       (Judge Keeley)

UNITED STATES OF AMERICA,
RICHARD RAMIREZ, E. MACE,
MARK DIB, SALVATORE LANASE,
KAREN LAMBRIGHT, and JANET
BUNTS,

        Defendants,

## REPORT AND RECOMMENDATION

### I.  Procedural History

      The pro se plaintiff initiated this case on July 7, 2006, by filing a civil rights complaint and

Federal Tort Claims Act (FTCA) against the above-named defendants.  The plaintiff seeks relief for

the defendants' alleged indifference to his serious medical needs and negligent treatment of his medical

conditions.  On September 15, 2006, the plaintiff was granted permission to proceed as a pauper.  On

November 16, 2006, the plaintiff filed documents which purport to show exhaustion of administrative

remedies.  The plaintiff paid his initial partial filing fee on November 27, 2006.

      On November 27, 2006, the undersigned conducted a preliminary review of the file and

determined that summary dismissal was not appropriate at that time.  Summonses were issued that same

day.

      On February 20, 2007, defendant, Dr. Salvatore LaNasa, filed a Motion to Dismiss or in the

alternative for Summary Judgment with a memorandum in support.  Dr. LaNasa also filed an exhibit

affidavit and medical records pertaining to the plaintiff. A <u>Roseboro</u> Notice was issued on February 8, 2007.

On March 30, 2007, defendants, the United States of America, Richard Ramirez, Ellen MaceLeibson, Mark Dib, Karen Lambright, and Janet Bunts, filed a Motion to Dismiss, or alternatively, Motion for Summary Judgment. On April 2, 2007, these defendants filed sealed exhibits relating to their motion. On April 2, 2007, another <u>Roseboro</u> Notice was issued

On April 27, 2007, the plaintiff filed a Declaration in Opposition to the Defendant's Motion to Dismiss or in the Alternative Summary Judgment. Plaintiff also filed a brief in opposition, which addresses all the defendants' motions to dismiss. On May 8, 2007 and May 9, 2007, the defendants filed responses. Finally, on May 21, 2007, the plaintiff filed a brief in opposition to the responses filed by all the defendants.

Accordingly, this case is before the undersigned for a report and recommendation on the defendants' Motions to Dismiss, or in the Alternative, Motions for Summary Judgment.

## II. The Complaint

The plaintiff, who was designated to FCI Gilmer some time in September, 2003, alleges that soon after his arrival he complained to the medical staff about a chronically painful tumor on the left diaphragm of his body which caused pain and uncontrollable twitching and spasms. Plaintiff also alleges that he reported to the medical staff that he suffered from chronic, painful swelling of the lymph nodes and glands in his neck, under both arms and in his groin. He also claims he told the staff that he had blood in his stool. Following what the plaintiff describes as a "cursory examination" he was advised that nothing was wrong and that a follow-up examination would not be necessary.

The plaintiff goes on to allege that despite his continued complaints, he was not examined by

a physician until October 19, 2004, when LaNasa, a general surgeon, examined him. As a result of the examination, LaNasa ordered x-rays and CT scans. The plaintiff alleges that the results of the testing indicated atalectasis in the linguina segment with elevation of the diaphragm on the left to the seventh intercostal space. He also alleges that the reports showed that the cause of the elevated left diaphragm included tumor, paralysis of the left phrenic nerve, loss of lung volume of another etiology, and possible pneumonia. Finally, the plaintiff alleges that his blood tests revealed abnormal cancer markers, low red blood cells, and abnormal creatine levels. Despite these finding, the plaintiff claims LaNasa advised him that nothing was wrong.

The plaintiff contends that he requested further comprehensive testing, including a biopsy and examination by a specialist but these requests were denied by all the defendants. However, an additional CT scan was performed on February 26, 2006, which again indicated a tumor with elevation of the left diaphragm and platelike atalectasis or scarring in the left lower lobe of the lung.

During a follow-up examination with LaNasa, the plaintiff notes that he again requested microscopic examination/biopsy of his painful, swollen lymph nodes and tumor. However, LaNasa replied "your swollen lymph nodes and tumor are benign, they are just part of you, it's rare but I don't want to do a biopsy." The plaintiff alleges that when he asked how it was possible to determine that the lymph nodes and tumor were benign without performing a biopsy, the defendants all stated "there's nothing wrong with you," "you don't need to see a specialist nor have a biopsy."

The plaintiff further alleges that despite his continued pain, and evidence for that pain, his pain and seizure medications were discontinued sometime in February 2006. Those medications were Tylenol #3 and Phenobarbital. Accordingly, the plaintiff alleges that he unnecessarily was left without sufficient pain treatment.

On April 28, 2006, the plaintiff underwent a colonoscopy because of stomach pain and blood in his stool. The colonoscopy revealed a polyp with internal prolapse. Biopsy of the polyp indicated that it was an adenomatus polyp, which the plaintiff explains means it was cancerous or precancerous with miotic activity. Although the polyp was removed, the plaintiff complains that he received no post-operative treatment for the mitotic activity in the colonic mucosa of the polyp and its surrounding area.

The plaintiff alleges that he continued to have blood in his stool, stomach pain, twitching, spasms, swollen lymph nodes, swollen glands with chronically painful tumor on the left diaphragm, atalectasis in the left lung, paralysis of the phrenic nerve on the left side and loss of lung volume. The plaintiff further alleges that when he asked for treatment and medically appropriate diagnosis concerning the tumor on his left diaphragm, "defendant Bunts replied 'when do you go home?;' defendant Lambright replied 'we're not going to fool with that anymore'; defendant Dib replied 'I don't know what to tell you'; defendant LaNasa replied 'I never told you that you had a tumor'; and defendants Ramirez and E. Mace also refused to discuss the matter." Accordingly, the plaintiff contends that his tumor has been left untreated and undiagnosed and continues to cause him discomfort.

With respect to his Bivens Complaint, the plaintiff specifically alleges that the defendants, Ramirez, Mace, Dib, LaNasa, Lambright, and Bunts, were employees, agents, physicians, and policymakers in respect to health care at FCI Gilmer and were acting under color of federal law. The plaintiff further alleges that defendants, Ramirez, Mace, Bunts, and Lambright, individually and in conjunction with one another, set policy with respect to the provisions of medical care given to him and other inmates at FCI Gilmer. He also alleges that they had a duty to administer and call for appropriate medical care and to relieve pain and suffering to the plaintiff and other inmates. The plaintiff alleges that defendants, LaNasa and Dib, individually and in conjunction with one another, personally directed

4

and participated in the decisions, actions and omissions outlined in his complaint relative to his need for medical care, treatment, and diagnostic testing. He alleges that they, as well, had a duty to administer and call for appropriate medical care and to relieve his pain and suffering.

The plaintiff claims that as a result of the actions of all these individual defendants, he has been left with a tumor and possible cancer and has sustained severe pain and suffering, emotional distress and injuries, mental stress and injuries, physical stress and injuries, the inability to function normally, the inability to sleep, the inability to stay asleep, fear, twitching, spasms, aggravated scarring in the left lower lobe, loss of lung volume, aggravated tumor or elevation of the left diaphragm, progressing atalectasis, aggravated swollen and painful lymph nodes, possible irreversible damages or medical complications, denial of necessary medical care, denial of specialist care and examination, as well as other injuries and other damages which at this time are not fully known. The plaintiff further claims that the actions of these individual defendants have resulted in the deprivation of his rights under the Fifth and Eighth Amendments to the United States Constitution. As damages, the plaintiff seeks compensatory and punitive damages in the amount of $3,000.000, as well as attorney fees and interest.

With respect to his FTCA, the plaintiff alleges that defendants, Ramirez, Bunts, Mace, Lambright, and Dib were at all times relevant to the complaint, employees of the United States of America and were acting within the scope of their employment. The plaintiff further alleges that these defendants breached their duty to provide him with reasonable and appropriate medical care, testing and diagnosis while he was incarcerated at FCI Gilmer. As a result, the plaintiff alleges that he has sustained severe pain and suffering, emotional distress and injuries, some of which are permanent. Pursuant to 28 U.S.C. § 1341(b) and 28 U.S.C. § 2671, et seq., the plaintiff contends that the United States is liable for the negligent actions of these defendants as outlined in his complaint. Therefore, the

plaintiff seeks judgment in his favor and against the United States of America for compensatory damages, attorney fees, interest an such other relief as the court deems appropriate.

## III.  Defendant, LaNasa, M.D's  Motion to Dismiss or in the Alternative for Summary Judgment

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Salvatore LaNasa, M..D., filed a motion to dismiss the plaintiff's complaint against him with prejudice for failure to state a claim upon which relief can be granted.  In the alternative, Dr. LaNasa seeks an award of summary judgment in his favor.

In support of his motions, Dr. LaNasa argues that the plaintiff's claims do not, even if the facts are assumed to be true, rise to the level of deliberate indifference required by law.  In addition, Dr. LaNasa argues that the plaintiff failed to comply with the prerequisites for filing an action under the Medical Professional Liability Act.

## IV.  Defendants, United States of America, Richard Ramirez, Ellen Mace Leibson, Mark Dib, Karen Lambright, and Janet Bunts, Motion to Dismiss, or Alternatively, Motion for Summary Judgment

In support of their Motions, these defendants allege that the plaintiff has failed to state a claim upon which relief can be granted.  In addition, they argue that the plaintiff failed to exhaust his mandated administrative remedies.  Finally, they assert that they are immune from this action.

## V.  Standard of Review

## A.  Motion to Dismiss

In ruling on a motion to dismiss the Court must accept as true all well-pleaded factual allegations.  Walker v. True, 399 F.3d 315 (4th Cir. 2005).  Furthermore, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and

construing the allegations in the light most favorable to the plaintiff, it is clear, as a matter of law, that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 4506 (1957).

## B. Summary Judgment

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 *1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a

genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." <u>Id.</u> "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. <u>Anderson</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u> at 587 (citation omitted).

## VI. ANALYSIS

### A. Exhaustion of Administrative Remedies

A <u>Bivens</u> action like an action under 42 U.S.C. §1983, is subject to exhaustion of administrative remedies as required by the Prison Litigation Reform Act (PLRA). <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002). Under the PLRA, a prisoner bringing an action "with respect to prison conditions" under 42 U.S.C. §1983 must first exhaust all available administrative remedies. 42 U.S.C. §1997e. Exhaustion as provided in §1997e(a) is mandatory. <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001). While the phrase "with respect to prison conditions" is not defined in 42 U.S.C. §1997e, the Supreme Court has determined that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516 (2002).[1]

---

[1]In <u>Porter</u>, an inmate sued the correctional officers who had severely beaten him. The inmate alleged that the correctional officers "placed him against a wall and struck him with their hands, kneed him

8

Moreover, exhaustion is even required when the relief the prisoner seeks, such as monetary damages, is not available. <u>Booth</u>, 532 U.S. at 741.

The United States Supreme Court has held that proper exhaustion of administrative remedies is necessary, thus precluding inmates from filing untimely or otherwise procedurally defective administrative grievances or appeals and then pursuing a lawsuit alleging the same conduct raised in the grievance. <u>See</u> <u>Woodford v. Ngo</u>, 126 S.Ct. 2378 (2006). In <u>Woodford</u>, the United States Supreme Court clarified that the PLRA exhaustion requirement requires proper exhaustion. <u>Id</u>. at 2382. The Court noted that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." <u>Id.</u> at 2386. The Court found that requiring proper exhaustion fits with the scheme of the PLRA, which serves three main goals: (1) eliminating unwarranted federal court interference with the administration of prisons; (2) "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"; and (3) to "reduce the quantity and improve the quality of prisoner suits." <u>Id</u>. at 2388. As the Court concluded, "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." <u>Id</u>.

The actions of the defendants regarding improper medical care constitute actions "with respect to prison conditions" within the meaning of the PLRA, and the requirement of exhaustion of administrative remedies applies to those actions and the alleged effects of those actions.

The BOP provides a four-step administrative process beginning with attempted informal

---

in the back, [and] pulled his hair." <u>Porter</u>, 534 U.S. at 520.

resolution with prison staff (BP-8). If the prisoner achieves no satisfaction informally, he must file a written complaint with the warden (BP-9),within 20 calendar days of the date of the occurrence on which the complaint is based. If an inmate is not satisfied with the Warden's response, he may appeal to the regional director of the Federal Bureau of Prisons (BP-10) within 20 calendar days of the Warden's response. Finally, if the prisoner has received no satisfaction, he may appeal to the office of the General Counsel (BP-11) within 30 calendar days of the date the Regional Director signed the response. An inmate is not deemed to have exhausted his administrative remedies until he has filed his complaint at all levels. 28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F.Supp. 941, 943 (D.Md. 1997).

The plaintiff has filed several administrative remedies regarding his medical care at FCI Gilmer as disclosed by SENTRY, the Bureau's electronic record system. The first of these administrative remedies was filed on August 23, 2004 (Remedy ID 348953-F1) and complained about inadequate medical care for his swollen lymph nodes. The remedy was partially granted at the institutional level on September 10, 2003, as it was noted that the plaintiff would receive an additional CT scan of his neck the next time the CT van was at FCI Gilmer. Plaintiff's appeal of the response to the Regional Office (Remedy ID 348953-R1) was denied on October 27, 2004. Plaintiff appealed the denial to the Central Office level twice (Remedy ID 348593-A1 and A2), where both appeals were rejected for plaintiff's failure to attach a copy of the institutional-level remedy on A1, and for his failure to submit an appropriate number of continuation pages on A2. Plaintiff was advised on both occasions that he could re-submit his appeal in the proper format within 15 days. Plaintiff never re-filed the appeal with the Central Office. (Dckts. 47-2, 47-7 ).

The plaintiff's second administrative remedy was filed at the institutional level on September 13, 2005 (Remedy ID 388555-F1) and complained of inadequate medical care and stated a fear that he might have cancer. The remedy was denied at the institutional level on September 23, 2005. Plaintiff appealed to the Regional Office level (Remedy ID 388555-R1) on October 7, 2005 and was denied on January 19, 2005. On March 14, 2006, plaintiff appealed to the Central Office level (Remedy ID 388555-A1), where it was rejected as being untimely. (Dckt. 47-3).

The plaintiff's third administrative remedy was filed at the institutional level on November 4, 2005 (Remedy ID 394045-F1) regarding the care for his Hepatitis C. The remedy was denied at the institutional level on November 10, 2005. Plaintiff appealed the denial to the Regional Office level on December 5, 2005 (Remedy ID 394045-R1), where it was denied on February 3, 2006. Plaintiff did not appeal this remedy to the Central Office level. (Dckt. 47-4).

The plaintiff's fourth administrative remedy was also filed at the institutional level on November 4, 2005 (Remedy ID 394045-F1) and requested that he receive a biopsy to diagnose his lung abnormality. The remedy was denied at the institutional level on November 10, 2005. Plaintiff appealed to the Regional Office Level on November 25, 2005 (Remedy ID 394046-R1), where it was denied on December 6, 2006. Plaintiff appealed the denial to the Central Office level on December 29, 2005. Plaintiff was provided an informational response only on January 24, 2006, (Remedy ID 394046-A1) at which time his administrative remedy request was closed. The response reviewed plaintiff's medical care and noted that another CT scan was to be performed and that following the CT scan results, a determination would be made regarding his plan of care. (Dckt. 47-5).

The plaintiff filed his final medical administrative remedy at the institutional level on April

11

26, 2006 (Remedy ID 411365-F1), complaining about his care and requesting Tylenol 3 and Phenobarbital.  The remedy was denied at the institutional level on May 17, 2006.  Plaintiff appealed the denial to the Regional Office level (Remedy ID 411365-R1) on May 31, 2006, where it was denied on July 27, 2006.  Plaintiff appealed the denial to the Central Office level on August 16, 2006 (Remedy ID 411265-A1), after he had already filed the complaint in the instant case.  Plaintiff's appeal was denied at the Central Office level on October 2, 2006.  (Dckt. 47-6).

The plaintiff clearly failed to properly exhaust his administrative remedies with regard to inadequate medical care for his swollen lymph nodes, his fear that he might have cancer, and the care he was receiving for his Hepatitis C.  Plaintiff initiated an administrative remedy on each of these claims (Remedy ID 349853-F1, Remedy ID 388555-F1, Remedy ID 394045-F1), but failed to fully complete each level of the process on these claims, thereby failing to properly exhaust his administrative remedies.  Plaintiff's failure to do so bars these claims and dismissal is appropriate.  See Woodford v. Ngo, 126 S.ct. 2378, 2387 (2006); Booth v. Churner, 532 U.S. 731, 741 (2001)(Where inmate exhausted his grievance at the first level but failed to complete all three levels of the Pennsylvania grievance process, dismissal for failure to exhaust was appropriate).  Additionally, with regard to Remedy ID 411365, dealing with his request for Tylenol 3 and Phenobarbital, plaintiff did not complete the administrative remedy process on that claim until October 26, 2006, months after he initiated this action on July 7, 2006.  The PLRA requires that an inmate exhaust his administrative remedies prior to filing suit.  See 42 U.S.C. § 1997e(a); see also Medinia-Claudio v. Rodriguez-Mateo, 292 F.3d 31 (1st Cir. 2002).[2]  Therefore, the only medical

---

[2]The first circuit noted the following circuits had ruled on the issue of whether exhaustion could be completed while the pendency of the civil action :

claim that plaintiff has exhausted is Remedy ID 394046, dealing with his request that he receive a lung biopsy to diagnose his lung abnormality.[3]    However, regardless of whether the plaintiff's claims are exhausted or not, it is clear that the plaintiff has failed to state any claim against any of the defendants upon which relief can be granted.

## B.  Claims Against Ramirez, Leibson, Dib, and LaNase

To state a claim under the Eighth Amendment, plaintiff must show that defendants acted with deliberate indifference to serious medical needs of a prisoner.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  A cognizable claim under the Eighth Amendment is not raised when the allegations reflect a

---

Neal v. Goord, 267 F.3d 116, 123 (2d Cir.2001) ("[A]llowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court."); Jackson v. Dist. of Columbia, 254 F.3d 262, 268-69 (D.C.Cir.2001) (rejecting the argument that § 1997e(a) "permits suit to be filed so long as administrative remedies are exhausted before trial"); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir.1999) ("The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit."); Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir.1999) ("An inmate incarcerated in a state prison, thus, must first comply with the grievance procedures established by the state department of corrections before filing a federal lawsuit under section 1983."); Perez v. Wis. Dep't of Corr., 182 F.3d 532, 535 (7th Cir.1999) ("[A] suit filed by a prisoner before administrative remedies have been exhausted must be dismissed; the district court lacks discretion to resolve the claim on the merits, even if the prisoner exhausts intra-prison remedies before judgment."). But see Williams v. Norris, 176 F.3d 1089, 1090 (8th Cir.1999) (per curiam) (reversing district court's dismissal for failure to exhaust where "the record demonstrated that [plaintiff's] grievance had been denied ... at the time the court ruled").
Medina-Claudio v. Rodriguez-Mateo, 292 F.3d 31, 36 (1st 2002).

[3]Although the defendants employed by FCI Gilmer allege that the plaintiff failed to exhaust any of his administrative remedies, they provide no explanation why this remedy is not exhausted. The plaintiff clearly filed at all three levels in a timely manner and received a response at each level.  The fact that the plaintiff was provided a response from the Office of General Counsel that was noted as being for informational purposes only, does not, in the view of the undersigned, make the claim unexhausted.

mere disagreement between the inmate and a physician over the inmate's proper medical care, unless exceptional circumstances are alleged. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991). When dealing with claims of inadequate medical attention, the objective component is satisfied by a serious medical condition.

A medical condition is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.1990), *cert. denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir.1987) *cert. denied,* 486 U.S. 1006 (1988).[4]

A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth 834 F.2d at 347. Thus, while failure to provide recommended elective knee surgery does not violate the Eighth Amendment, Green v. Manning, 692 F.Supp. 283 (S.D. Ala.1987), failure to perform elective surgery on an inmate serving a life sentence would result in permanent denial

---

[4] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997).

of medical treatment and would render the inmate's condition irreparable, thus violating the Eighth Amendment. Derrickson v. Keve, 390 F.Supp. 905,907 (D.Del.1975). Further, prison officials must provide reasonably prompt access to elective surgery. West v. Keve, 541 F. Supp. 534 (D. Del. 1982) (Court found that unreasonable delay occurred when surgery was recommended in October 1974 but did not occur until March 11, 1996.)

The subjective component of a "cruel and unusual punishment" claim is satisfied by showing deliberate indifference by prison officials. Wilson, 501 U.S. at 303. "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Basically, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

Even if this court were to assume that the plaintiff herein suffers from serious medical needs or conditions, the medical records establish that he has received thorough and timely medical treatment for these conditions during his incarceration at FCI Gilmer. Therefore, the plaintiff's Eighth Amendment rights clearly have not been violated.

As previously noted, the plaintiff arrived at FCI Gilmer in September of 2003. Dr. Ellen Mace Leibson is the Clinical Director at FCI Gilmer and is a licensed physician board certified by the American Board of Family Physicians. (Dckt. 48-6, p. 1). Dr. Leibson has reviewed the plaintiff's medical records, dating back to his arrival at FCI Gilmer and summarized the same. (Dckt. 48-6). Her declaration and the sealed medical records establish that at the time the plaintiff arrived at FCI Gilmer

he had no complaints although he had a history of a positive tuberculosis skin test, seizures, and a left leg prosthesis due to a below the knee amputation. His medications, upon arrival, were Dilantin and Phenobarbital for the seizures and Isoniazid, which is used to prevent active tuberculosis in persons who have an abnormal skin test for tuberculosis.

The plaintiff was first seen for swollen lymph nodes on March 22, 2004. He was diagnosed with an ear infection, which was thought to be the cause of the swollen glands and prescribed antibiotics. On April 26, 2004, he was seen again for swollen lymph nodes as well as for abdominal pain. Dr. Doris Williams, the then Clinical Director, prescribed laxatives and stool softeners for constipation, ordered a CT scan, and told the plaintiff to return in one week for follow-up. Plaintiff underwent abdomen and chest x-rays on April 16, 2004.

Plaintiff was seen again on May 7, 2004 for swollen lymph nodes by PA Maida. On exam, plaintiff's tonsils were not enlarged and no axillary (armpit) lymphadenopathy (swollen glands) was noted. However, plaintiff persisted in seeing a physician, and the PA gave him a referral to the Clinical Director. PA Maida reassured plaintiff that "this was not likely a [cancer] syndrome due to patient's physical exam." (Dckt. 48-1, p. 16).

Plaintiff was examined on June 7, 2004 and his neck was supple with nontender cervical lymphadenopathy bilaterally. PA Lichty noted that Plaintiff's referral to Dr. Williams was done and that a request for neck and chest CT scan was sent to the Utilization Review Committee ("URC"). PA Lichty noted that he was a chronic smoker. Dr. Williams saw plaintiff on June 8, 2004 for follow-up of chronic gland swelling. She noted that plaintiff was "very concerned about possible cancer." (Doc. 48-1, p. 13). Upon palpitation, plaintiff had minimal discomfort. Dr. Williams discussed plaintiff's lab results, which included normal CBC, normal thyroid profile, and positive Hepatitis C virus. Dr.

Williams ordered labs to be repeated in July and made referrals for neck and thorax CT scans with and without contrast.

On June 25, 2004, the URC approved the request for CT scan and evaluation of plaintiff's prosthesis. Plaintiff was seen in follow-up on June 29, 2004, at which time PA Swanson again noted that April 2004 CBC labs were within normal limits. PA Swanson also noted that plaintiff's nodes in the neck were soft and palpable, nontender, and not excessively large.

On July 19, 2004, Dr. Williams noted that plaintiff's neck nodes were essentially unchanged from June 8, 2004. Plaintiff did have a new onset of right inguinal (groin area) lymphadenopathy. Dr. Williams ordered labs, including CBC, CMP/LFT's and sedimentation rate. She noted that she would follow up with plaintiff upon return of the lab results. On July 22, 2004, plaintiff's neck CT was performed.

On August 2, 2004, Dr. Williams saw plaintiff and discussed his lab results and CT scan report. She noted that plaintiff was very anxious about the possibility of cancer being the cause of his lymphadenopathy. She ordered a repeat chest x-ray and noted that she would resubmit consults to the URC for CT scans of the neck and thorax with and without contrast.

On August 13, 2004, plaintiff complained of persistent lymph node swelling of the neck, armpits, and bilaterally in the groin. There was no axillary lymphadenopathy on palpation and the right inguinal lymphadenopathy noted on August 2, 2004 was resolved. Plaintiff was prescribed medication, including an antibiotic, and Dr. Williams ordered repeat labs. On August 17, 2004, Dr. Williams saw plaintiff again and noted that the neck CT was normal, thorax CT was pending, and repeat labs were pending.

On August 20, 2004, plaintiff saw PA Marwan Dib for lymphadenopathy. Plaintiff also complained of hematuria (blood in the urine), although his last urinalysis was negative. He further complained that he had scars which had turned darker than his normal skin color. PA Dib prescribed prednisone for inflammation, referred plaintiff to psychology for evaluation of depression, and noted that CT of the thorax and labs were pending.

Plaintiff was seen again on August 30, 2004 and September 27, 2004, at which time he reported that he had stopped smoking. On October 13, 2004, plaintiff underwent CT scans of his abdomen, neck and thorax. The abdomen CT was unremarkable, but there was an elevated left hemidiaphragm evident. The chest CT scan showed atelectatic change or infiltrate in the left lower lobe of the lung and was otherwise unremarkable. The neck CT scan was unremarkable; there was no mass or asymmetry seen within the neck. It was noted that upon CT scan, the lymph nodes were visible, but not significantly large and there was no lymphadenopathy.

On October 13, 2004, PA Dib saw plaintiff for lymphadenopathy. On October 19, 2004, P.A. Lichty noted that CT reports were unremarkable studies of the neck, abdomen and pelvis. Further, she noted that "[d]espite all negative studies, per Dr. Williams, will refer to general surgeon for second opinion of possible ganglion cyst in neck." (Dckt. 47-11, p. 39). The referral to the general surgeon was approved on October 27, 2004. On November 4, 2004, plaintiff had a chest x-ray, following up on the earlier chest CT which had shown atelatic change or infiltrate in the left lower lobe pf the lung. It was noted that possible etiologies of the elevated left diaphragm included mass, tumor, pneumonia, or phrenic nerve pathology.

Plaintiff was seen on November 8, 2004, where the provider[5] noted the elevated left hemidiaphragm and questionable etiology and noted that CT scan results would be sent to Walter Reed Army Medical Center for comparison. Plaintiff was seen on November 30, 2004, December 3, 2004, December 17, 2004, December 22, 2004, December 27, 2004, January 5, 2005, January 10, 2005, January 11, 2005, January 31, 2005, February 3, 2005, and February 8, 2005, during which time his complaints centered mostly on his prosthesis and pain therefrom. PA Dib saw plaintiff for the last two December visits and the first two February visits, at which time plaintiff was evaluated and prescribed medication, including Tylenol 3. A February 18, 2005 administrative note indicates that Dr. Williams discussed with Dr. Ramirez renewing plaintiff's prescription for Tylenol 3 for an additional 30 days for pain in the amputated leg, which Dr. Ramirez approved.

Plaintiff was seen on March 1, 2005 for follow-up of muscle pain. On March 15, 2005, plaintiff again went to Health Services with multiple complaints, including chronic, painful swollen neck glands. Upon examination, plaintiff had bilateral cervical lymphadenopathy without tenderness on palpation.

Plaintiff was seen again in Health Services on March 31, 2005, April 5, 2005, April 19, 2005, May 9, 2005, June 6, 2005, June 20, 2005, June 30, 2005, and July 27, 2005, complaining of back pain, ear problems, and prosthesis issues.

On August 2, 2005, Dr. Mace Leibson saw plaintiff for the first time.  He denied any seizures but wished to increase his Dilantin. He further complained of left chest pain from a "collapsed lobe." (Dckt. 47-10, p. 25)   No complaint of lymphadenopathy was noted at that time. Medications were

---

[5]The signature is not legible, but it appears it was one of the staff osteophaths.

renewed as prior along with the increase in the Dilantin as requested. He was seen again on August 6, 2005 and August 9, 2005, complaining mostly of ear pain.

On August 15, 2005, plaintiff again complained of pain in his ear, and swollen and painful lymph nodes in the neck, armpits and groin. He reported having these problems for 19 months. The provider noted that plaintiff had no swollen area on the throat and that he was "seen multiple times for same problems." (Dckt. 47-10, p. 21). On August 23, 2005, Dr. Dotzman saw plaintiff for multiple complaints, and noted that labs were signed off as normal. On August 26, 2005, plaintiff reported to Health Services for a refill of his Tylenol 3.

On August 29, 2005, Dr. Dotzman again saw plaintiff in Health Services and noted that he spoke with plaintiff at length. He noted "[patient] has unreasoning fear that he 'has cancer.'" (Dckt. 47-10, p. 14). Dr. Dotzman further noted that lab tests were returned essentially normal and that a previous CT scan of the neck was likewise normal. He noted "this has been explained to patient several times." (Id.) Additionally, the doctor wrote "[i]t almost seems that the patient wants something to be wrong with him." (Id,). He noted that CEA results were not clinically significant, and offered to repeat plaintiff's labs in one month.

On August 30, 2005, plaintiff reported to Health Services with multiple complaints and still questioning his lab results. Dr. Dotzman noted "does not want to understand all is normal." (Dckt. 47-10, p. 13). Plaintiff had no palpable lymphadenopathy at that time. Dr. Dotzman ordered a refill of plaintiff's Phenobarbital for seizures and Tylenol 3.

Plaintiff was seen again on September 1, 2005 and September 8, 2005. PA Dib saw plaintiff on September 2, 2005 and assessed only left testicular pain. On September 15, 2005, Dr. Dotzman

noted that plaintiff's lab work was reviewed and all tests were within normal limits, with the exception of his cholesterol, which was slightly increased. A September 22, 2005 note states that plaintiff had a surgical consult with Dr. LaNasa.[6]

Dr. Dotzman saw plaintiff again on October 3, 2005 with multiple complaints, including mouth ulcers. Prescriptions for Dilantin and phenobarbital were renewed. On October 11, 2005, plaintiff reported to sick call for the mouth ulcers, complaining that he could not eat. PA Dib prescribed medication and a mouthwash solution for pain.

On October 31, 2005, PA Dib saw plaintiff for follow-up regarding his CT scan. Plaintiff was requesting a lymph node biopsy. PA Dib noted left lymphadenopathy and ordered follow-up CT scans with and without contrast for neck, chest and abdomen. He noted that he would hold off on a biopsy pending the CT report. Also on October 31, 2005, Dr. Mace Leibson cosigned an order written to discontinue the Phenobarbital previously ordered for plaintiff due to noncompliance, but instead placed him on a different dosage.

On December 19, 2005, Dr. Anderson noted plaintiff's labs on his Dilantin and Phenobarbital levels. Plaintiff's Dilantin was changed from 200mg twice per day to 300 mg at bedtime.

---

[6]Dr. LaNasa, who is a surgeon in private practice in Lewis County, West Virginia, is neither an employee of the Federal Bureau of Prisons, nor of the United States. He saw the plaintiff for the first time in September of 2005 concerning possible enlarged lymph nodes in the plaintiff's neck. Dr. LaNasa examined the plaintiff and evaluated his medical records, including a CT scan showing the neck. Based on his examination of the plaintiff and review of his records, Dr. LaNasa was of the opinion that, other than nonspecific minimal enlargement, the lymph nodes showed no signs of malignancy. Furthermore, it was his opinion that no treatment other than observation was appropriate at that point. However, he also noted that he would consider excising a lymph node for further evaluation if the nodes increased in size. Dr. LaNasa was never re-consulted concerning any increase in the size the plaintiff's lymph nodes.(Dckt. 40-2, pp. 1-2).

On December 27, 2005, plaintiff reported to sick call requesting a work idle, which was denied. His chart reflects that plaintiff did not complain about swollen lymph nodes on that occasion, but was very upset that his request for an idle was denied.

On January 13, 2006, plaintiff had a follow up appointment after his outside medical trip the day before. PA Dib noted that no biopsy was indicated and plaintiff should return as needed.

A February 3, 2006, CT scan of the neck was normal. A February 3, 2006 thoracic CT showed slight elevation of the left diaphragm with some platelike atalectasis or scarring in the left lower lobe with no lymphadenopathy seen. An abdominal CT showed a tiny cyst in left kidney but was otherwise unremarkable.

On February 3, 2006, Dr. Mace Leibson saw plaintiff for a recheck of his leg. Plaintiff complained about the time of his pill line, stating that he could not make it to the 6:30 a.m. pill line to pick up his Phenobarbital. He requested an afternoon pill line for that prescription, but noted that he had not taken that dose for some time. Dr. Mace Leibson noted that he reported being afraid of having a seizure, but no seizure activity has been noted. Dr. Mace Leibson noted that plaintiff was "very manipulative." (Dckt. 47-9, p. 25). She assessed his leg and noted that CT scan results on the neck were pending. She added a prescription for Topamax for plaintiff's seizure disorder and discontinued the 6:30 a.m. dose of Phenobarbital but left the afternoon and evening pill line doses as previous. She renewed plaintiff's Tylenol 3 for three days only and provided him with a better fitting silicone prosthetic sock.

On February 6, 2006, Dr. Mace Leibson saw plaintiff again. He reported the silicone sock had been helpful. He wanted to continue his Tylenol 3 and "does not want to come off Phenobarb." (Dckt.

47-9, p. 24). Dr. Mace Leibson noted that plaintiff was "very demanding and aggressive with me verbally." (Id.) She noted that plaintiff "told me how he needed to be treated." (Id. at 23). Despite his attempts at intimidation, Dr. Mace continued the examination. (Dckt. 48-6, p. 6). She noted that his leg was almost fully healed and that although plaintiff indicated it was sore, he showed no signs of pain when she touched it. He also was able to ambulate without his cane, gait disturbance, or signs of pain.

On February 7, 2006, Dr. Mace saw plaintiff for continued complaints of pain and rubbing of his prosthesis. He refused a wheelchair or crutches. She noted that a correctional officer was present with plaintiff due to the fact that he had received an incident report for his behavior in Health Services the day before. (Dckt. 48-6, p. 7). Dr. Mace Leibson saw plaintiff again on February 12, 2006, for follow up on prosthesis and complaints of pain and prescribed Indocin 50 mg for 3 days for his pain.

On February 14, 2006, Dr. Mace Leibson noted that plaintiff's last Phenobarbital level was barely therapeutic and plaintiff was noncompliant with that medication. She noted that the medication was being tapered, and he had no seizure activity. She further noted that plaintiff was trying to manipulate for Tylenol 3, although his leg looked excellent, and he was told that the Tylenol 3 was not medically indicated and would not be prescribed.

On February 27, 2006, plaintiff reported to sick call complaining of side effects from his new seizure medication. Dr. Mace Leibson found that plaintiff was not compliant with Topamax and had taken only 9 doses. Plaintiff persisted in being prescribed Phenobarbital again and was told that he had not taken enough Topamax to decrease seizure activity. Dr. Mace Leibson advised that she

would leave him only on Dilantin. She noted he was very unhappy with this, but was advised that he would not be given more medication than necessary. Dr. Mace Leibson had to tell plaintiff to leave her office after he raised his fist at her. (Dckt. 48-6, p. 7). Dr. Mace Leibson discontinued plaintiff's Topamax on that date.

Dr. Mace Leibson assessed plaintiff on March 3, 2006, when it was noted that plaintiff reported a history of colon polyps in 1997 and reported being constipated. This was the first time plaintiff had reported a history of colon polyps. Dr. Mace Leibson noted that the constipation was likely induced by Tylenol 3 and seizure medication. She arranged a colonoscopy to check for polyps and rectal bleeding.[7] She also prescribed Tegretol for plaintiff's seizure disorder. An abdominal x-ray on the same date showed a large amount of stool and non-obstructive bowel gas pattern. On April 4, 2006, plaintiff's Tegretol was discontinued because he refused the medication after reporting side effects.

On April 11, 2006, plaintiff reported to Health Services requesting Phenobarbital and Tylenol 3 for seizures and chronic pain. PA Dib noted that plaintiff had no seizures while being on Dilantin, but further noted that lymphadenopathy may be an associated side effect of Dilantin. PA Dib prescribed Trileptal as an adjacent therapy for seizure disorder and advised plaintiff to not discontinue Dilantin.

---

[7]Dr. LaNasa performed a colonoscopy on the plaintiff in or about April of 2006. The colonoscopy revealed redundant colon with internal prolapse and a single small polyp. The polyp was removed for pathologic examination which revealed an adenomatous polyp. As a result of the adenomatous polyp, Dr. LaNasa suggested that the plaintiff have a repeat colonoscopy in approximately one year.

On May 12, 2006, plaintiff was examined and had a tender prostate on exam. He was prescribed medication. On May 23, 2006, plaintiff reported having a tumor in his abdomen. He was examined and found to have soft, nontender abdomen with normal bowel sounds. He was scheduled for an appointment with his primary care provider.

On May 24, 2006, it was noted that plaintiff was approved for a repeat colonoscopy in two to three years based upon the history of polyps. PA Dib saw plaintiff on May 25, 2006 for complaints of rectal bleeding. Upon examination, plaintiff's abdomen was benign, but he had tenderness upon rectal examination. However, he was negative for hemoccult or masses and had a normal prostate. PA Dib ordered labs and prescribed Depakote.

On May 30, 2006, plaintiff reported having stomach pain and cramping and stated that he had a tumor in his colon. On June 12, 2006, plaintiff was seen for rectal bleeding and pain. Upon examination, his abdomen was soft and nontender and with normal bowel sounds. The diagnosis was probable irritable bowel syndrome. PA Dib prescribed an antispasmotic medication, Bentyl, and fiber. Dr. Lanasa was consulted concerning follow-up of the colonoscopy and met with plaintiff and explained to him the findings and recommendations for further care. (Dckt. 40-2, p. 3). On June 19, 2006, it was noted that hemoccult cards were negative and he was prescribed a stool softener and fiber powder. On June 20, 2006, plaintiff was seen and requested different seizure medication, stating that Depakote was making him bleed during bowel movements. Dr. Mace Leibson noted that she would not add more seizure medication and that significant time was spent discussing the colonoscopy results again. She placed his dilantin on "pill line observed dosing" to ensure

compliance with medication. (Dckt. 48-6, p. 8).[8]

On August 14, 2006, plaintiff saw PA Dib, who noted that plaintiff continued to insist that he has blood in his stool and abdominal cramping. Plaintiff was prescribed Amoxil for sinusitis, Bentyl, and advised to get rest and plenty of fluid intake. Plaintiff was seen on several other occasions the rest of 2006, voicing similar complaints. On January 2, 2007, Plaintiff's Dilantin dose was changed due to his levels.

On January 30, 2007, PA Dib noted that plaintiff was worried about cancer, Hepatitis C, elevated blood pressure, and swollen lymph nodes in his neck. PA Dib ordered labs, and advised Plaintiff on rest and fluids. Plaintiff was called to Health Services to review the lab results on February 22, 2007. All labs were normal with the exception of H. Pylori, for which he was positive. PA Dib prescribed medication and advised plaintiff to return as needed. He noted that he would repeat lipids and consider a stress test if plaintiff's upper abdomen pain continued after H. Pylori treatment.

In summary, it is clear that the plaintiff is convinced that he has cancer and that the medical personnel named in his complaint have been deliberately indifferent to his medical condition. However, the record in this matter clearly does not support his allegations of indifference. As the foregoing summary of the plaintiff's medical treatment at FCI Gilmer demonstrates, the plaintiff has been seen by the medical staff there at least twenty-five times for his complaints of lymphadenopathy, or enlarged lymph nodes. He has been prescribed medication for this condition, had a CT scan of the neck, which was normal, and was referred to Dr. LaNasa for a consultation. While the plaintiff may

---

[8]The plaintiff initiated his complaint in this court approximately two weeks after this entry.

want additional testing or treatment, that fact does not give rise to an Eighth Amendment violation. See Chance v. Armstrong, 143 F.2d 3rd 698, 703 (citing Dean v. Coughlin, 804 F.2d 207, 215 (2nd Cir. 1986) and Estelle 429 U.S. at 106. "The questions whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." Estelle, 429 U.S. at 107.

Furthermore, plaintiff's seizure disorder has been followed appropriately. Plaintiff's seizure medications have been changed as deemed necessary by the medical staff at FCI Gilmer. It is apparent that the plaintiff is displeased with having been switched from Phenobarbital to Dilantin. However, as noted in the medical records, plaintiff's last Phenobarbital level was barely therapeutic, and he was noncompliant with the medication. Furthermore, the plaintiff had no seizures while on Dilantin. Clearly, the medical staff prescribed appropriate medication to control the plaintiff's seizure disorder, and the denial of an inmates preferred course of treatment does not violate a constitutional right. Goff v. Bechtold, 632 F.Supp. 697, 698 (S.D.W.Va. 1986).

As to plaintiff's complaint about the withholding of pain medication, and specifically, Tylenol 3, the record demonstrates that the plaintiff is very manipulative regarding his complaints of pain. Plaintiff was seen numerous times for pain in his amputated leg and was fitted with a silicone sock to allow a better fit with his leg prosthesis. Although the plaintiff reported that the silicone sock was helpful, he wanted to continue Tylenol 3. Physical examination of his leg in February of 2006, revealed that he leg was almost full healed, and although he indicated it was sore, he showed no signs of pain when it was touched, As well, he was able to ambulate without his cane, gait disturbance, or signs of pain. Finally, on February 14, 2006, plaintiff was told that Tylenol 3 was not medically indicated and

would not be prescribed. Again, the denial of in inmate's preferred course of treatment does not violate a constitutional right.

Finally, with respect to plaintiff's fear that he has cancer following a polyp removal, it is clear that medical personnel have provided adequate treatment. The plaintiff first reported a history of polyps when he saw Dr. Mace Leibson on March 3, 2006. She arranged for a colonoscopy, which was performed by Dr. LaNasa in April of 2006. A poly was removed and a repeat colonoscopy has been approved per Dr. LaNasa's recommendation. The medical records consistently show that plaintiff's complaints regarding both the polyp and his concern over a tumor in his chest have been adequately followed. CT scans have been performed as well as repeated lab tests. All have been within normal limits.

In conclusion, the voluminous medical records supplied by the defendants demonstrate that the plaintiff has received timely and proper care for his multiple physical complaints. Nothing in the record or in the plaintiff's complaint establishes any facts sufficient to support a finding that the defendants, Ramirez, Mace Leibson, Dib or LaNasa have been deliberately indifferent to his medical needs, and accordingly, the plaintiff's complaint as it relates to these defendants should be dismissed for failure to state a claim.

**C. Claims Against Lambright and Bunts**

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001)(internal citation omitted). Thus, in order to establish personal liability under Bivens, a plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal

involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11ᵗʰ Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976). Instead, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F. 3d 4e96, 501 (2nde Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3ʳᵈ Cir. 1988).

Nonetheless, in Miltier v. Boern, 896 F.2d 848, 854 (4thh Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a Bivens action is the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury." Id. A plaintiff cannot, however, establish supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs. Id. Rather, the plaintiff must show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practice.

In this case, plaintiff names as defendants: Janet Bunts, former Health Service Administrator at FCI Gilmer, and Karen Lambright, who was the Assistant Health Service Administrator at FCI Gilmer during the periods outlined in the complaint. However, he makes no specific allegations against either of these defendants that would subject them to liability pursuant to Bivens. In fact, the only

specific allegations in the complaint that he makes against Defendant Lambright is that she stated "we're not going to fool with you anymore," when he asked for treatment and diagnosis of his left diaphragm tumor. In response to the same request, the plaintiff alleges in his com plaint that defendant Bunts replied "when do you go home"? This is clearly not the kind of personal involvement required to state a Bivens claim. In his response to the motion to dismiss, the plaintiff alleges that defendant Bunts, a Physician Assistant, and defendant Lambright, a Licensed Practical Nurse, "could have easily advise Lanas [sic] to remove the tumor, biopsy the tumor, or otherwise made provisions for care." However, Dr. LaNasa is a general surgeon, who is well qualified to determine whether plaintiff needed a biopsy. Furthermore, he is not employed by the Bureau of Prisons and is therefore not a subordinate of defendants Bunts and Lambright. Finally, these two defendants did not provide medical care to the plaintiff but simply acted in their capacity as administrators of the medical facility at FCI Gilmer. The plaintiff has shown no evidence that they authorized or were deliberately indifferent to any alleged constitutional violations. Nor, as stated in the previous section, as the plaintiff shown that there was any deliberate indifference on the part of the medical staff at the facility. Accordingly, the plaintiff cannot establish a claim against these defendants.

**D. Claims Under The Federal Tort Claims Act**

The Federal Tort Claims Act (FTCA) is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680.

The Supreme Court has held that "a person can sue under the Federal Tort Claims Act to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee."  United States v. Muniz, 374 U.S. 150 (1963).  However, the FTCA does not create a new cause of action.  Medina v. United States. 259 F.3d 220, 223 (4th Cir. 2001). "The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Id.

Under West Virginia law, certain requirements must be met before a health care provider may be sued.  W.Va. Code §55-7B-6.    This section provides in pertinent part:

**§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions**

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be

executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D.W.Va.2004).[9] There is nothing in the plaintiff's complaint which reveals he has met the requirements of W.Va. Code §55-7B-6. Thus, the undersigned recommends that his FTCA be dismissed.

## VII. RECOMMENDATION

In consideration of the foregoing, it is the undersigned's recommendation that the

---

[9]In Stanley, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury. The Court found that there was no conflict between the state pre-filing requirements and the pre-filing requirements of the FTCA. Stanley, 329 F.supp. 2d at 808-09. "{t]here is nothing to prevent a plaintiff from complying with both requirements." Id. at 809.

plaintiff's complaint (Dckt 1) be **DISMISSED** under 28 U.S.C. §§ 1915A and 1915(e) for failure to state a claim and the defendants' Motions to Dismiss, or in the Alternative, Motions for Summary Judgment (Dckts.40 & 46) be **GRANTED**.

Any party may file within ten (10) days after being served with a copy of this Recommendation with the Clerk of the Court written objections identifying the portions of the Recommendation to which objections are  made, and the basis for such objections.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Court.  Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of Court is directed to mail a copy of this Recommendation to the *pro se* plaintiff and all counsel of record.

DATED: July 6, 2007

/s/ James E. Seibert_____

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE